UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___10/9/2020___

Dionicio Cabrera,

                                        Plaintiff,

            -against-

United States Of America,

                                        Defendant.

1:18-cv-07270 (SDA)

OPINION AND ORDER

STEWART D. AARON, United States Magistrate Judge:

Plaintiff, Dionicio Cabrera ("Plaintiff" or "Cabrera"), filed suit against defendant, United States of America (the "United States" or "Defendant"), pursuant to the Federal Torts Claim Act (the "FTCA"), 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, for alleged injuries he suffered in a motor vehicle accident on August 7, 2015. Cabrera alleges that Shawnté Lorick ("Lorick"), an employee of the United States Probation Office for the Southern District of New York, who was driving a vehicle owned by the United States, collided with the vehicle that Cabrera was driving and that Lorick was negligent in the operation of her vehicle, causing the accident and causing Cabrera to suffer serious injuries. In turn, Defendant contends that Cabrera's alleged injuries were not caused by the August 7, 2015 motor vehicle accident and that, in any event, his injuries from the accident are not "serious" under the applicable law.

The parties consented to the jurisdiction of a United States Magistrate Judge, pursuant to 28 U.S.C. § 636, and the Court conducted a bench trial from October 5, 2020 through October 7, 2020. Having considered all the evidence and assessed the credibility of the witnesses, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52.

For the reasons set forth below, the Court finds that Cabrera has not proven the elements of his claim by a preponderance of the evidence. Thus, judgment shall be entered in favor of the United States.

## FINDINGS OF FACT[1]

### I.   The Accident

On the morning of August 7, 2015, a U.S. government-owned 2011 black Ford Explorer being driven by Lorick came into contact with the rear of a 2012 Toyota sedan being driven by Cabrera at or near a traffic light at the intersection of Louis Nine Boulevard and Boston Road, in the Bronx, New York. (*See* JPTO, Stip. ¶ 11; Trial Tr. at 11-12; Pl.'s FOF ¶¶ 1, 3, 4-5, 7-8; Def.'s FOF ¶¶ 1, 3-4, 7; Lorick Decl. ¶¶ 3-4, 9; JX 1 (Accident Report).)[2] At the time of the August 7, 2015 motor vehicle accident, Cabrera was working as a taxicab driver. (JPTO, Stip. ¶ 12; Tr. at 13.) The vehicle driven by Cabrera was owned by Neirys Wolmart ("Wolmart"), who was the policyholder on the insurance for the vehicle, provided by American Transit Insurance Company ("American Transit"). (JPTO, Stip. ¶ 13.) At the time of the August 7, 2015 motor vehicle accident, Probation

---

[1] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

[2] The Joint Pretrial Order (ECF No. 63), as prepared by the parties and approved by the Court, was entered on September 22, 2020. The Joint Pretrial Order is referred to herein as the "JPTO." On September 21, 2020, Plaintiff's Proposed Findings of Fact and Conclusions of Law (ECF No. 60) was filed. Citations to Plaintiff's proposed findings of fact are made using the following citation form: "Pl.'s FOF ¶ __." Citations to the trial transcript are made using the following citation form: "Tr. at __." On September 21, 2020, Defendant's Proposed Findings of Fact and Conclusions of Law (ECF No. 61) was filed. Citations to Defendant's proposed findings of fact are made using the following citation form: "Def.'s FOF ¶ __." The Declaration of Shawnté Lorick, dated September 21, 2020 ("Lorick Decl."), was accepted at trial as her direct testimony. (Tr. at 239.) The prefix "JX" is used to identify the parties' joint exhibits that were accepted into evidence at trial. (*Id*. at 232.)

Officer Lorick was operating a vehicle in the course of her employment by the United States. (*Id*. ¶ 14.)

American Transit paid for the repairs to Wolmart's vehicle necessitated by the accident, totaling $5,222.10. (JPTO, Stip. ¶ 16.) American Transit also paid $27,477.28 for Cabrera's medical bills for treatment purportedly relating to the motor vehicle accident. (*Id*. ¶ 17.) Cabrera is not seeking any damages for lost income, past medical expenses or property damage. (*Id*. ¶ 19.)

Cabrera, who testified at trial with the aid of a Spanish interpreter, stated that he was traveling on Louis Nine Street and that, before he got to the intersection, the car in front of him stopped so that a police car could go by. (*See* Tr. at 12.) He further testified that, while his vehicle was stopped, Lorick's vehicle ran into the back of him. (*See id*.) Cabrera testified that, "[a]fter [he] stopped [he] fe[lt] this huge sound like a bomb, a big boom, something that destroyed the back of [his] car." (*Id*.)

Lorick states that she had been completely stopped at the red traffic signal and that, a few seconds after she began to move forward (when the signal turned green), Cabrera's vehicle stopped short, causing her to collide with it, even though she had engaged her brakes. (Lorick Decl. ¶¶ 5-9.) Lorick explained that her vehicle was the third in the line of stopped cars at the traffic light and that she was directly behind Cabrera's vehicle. (Lorick Decl. ¶¶ 5-6; *see* JX 1 at USA00371 (Accident Report).) After the traffic signal turned green, and the vehicles in front of her began to proceed straight through the intersection, she began to move forward as well. (Lorick Decl. ¶ 7; *see* JX 1 at USA00371.) Then, after a few seconds, before either her vehicle or Cabrera's vehicle reached the intersection, Lorick saw the first car in the line stop short, causing Cabrera to stop short suddenly and come to a complete stop. (Lorick Decl. ¶ 8; *see* JX 1 at

3

USA00371.) Lorick engaged her brakes, but was unable to stop and the front bumper of her vehicle made contact with the rear bumper of Cabrera's vehicle. (Lorick Decl. ¶ 9.) The first car in the line drove off and did not remain at the scene of the accident. (Lorick Decl. ¶ 9; *see* JX 1 at USA00371.)

The police report included as part of Plaintiff's Exhibit 1 corroborates Lorick's account that the accident occurred shortly after the light changed from red to green. It states: "At TPO,[3] $D_1$ states that when the traffic signal turned green, the vehicle in front of him started to go, then stopped short, causing him to stop short. $D_1$ states that $D_2$ then rear ended him. $D_2$ states the vehicle in front of $D_1$ stopped abruptly causing $D_1$ to stop abruptly. $D_2$ states she then rear ended $D_1$."[4] (Pl.'s Ex. 1 at 5.) When asked about this document by me at trial, Cabrera testified that he told the police officer the words that are attributed to $D_1$ in this document. (*See* Tr. at 93.)

Lorick contends that the impact from the collision was "relatively light." (Lorick Decl. ¶ 10.) Lorick estimates that, prior to engaging her brakes, her vehicle's "speed was likely about five miles per hour." (*See id*. ¶ 9.) The photographs depicting the damage to the vehicles that were taken by both Cabrera and Lorick show damage to the rear driver's side of Cabrera's vehicle and damage to the front passenger side of Lorick's vehicle. (*See* JX 10 (Lorick Photos); JX 11 (Plaintiff Photos).)

Cabrera testified that, at the time of impact, he was wearing his seat belt. (Tr. at 16.) He further testified that, on impact, his "body went forward, then came backward," the "seat belt

---

[3] "TPO" stands for "time and place of occurrence." *See People v. Khachiyan*, 194 Misc. 2d 161, 161 (N.Y. Crim. Ct. 2002).

[4] $D_1$, or Driver 1, in the police report is identified as Cabrera, and $D_2$, or Driver 2, is identified as Lorick. (*See* Pl.'s Ex. 1 at 5.)

twisted [his] left shoulder," and his "knees hit the dashboard of the car and [his] knees twisted." (*Id*. at 15-16.) Cabrera did not lose consciousness or have any bleeding from the accident. (Cabrera Dep. 65:7-10;[5] Tr. at 42.) Less than 15 seconds after the accident, Cabrera exited his vehicle to assess the damage. (Cabrera Dep. 65:11-16; Tr. at 44.) At approximately 10:15 a.m., the police arrived on the scene and took an accident report. (JX 1 (Accident Report); Lorick Decl. ¶ 14; Tr. at 12-13.) No ambulance or other medical services were called to the scene of the accident, and Cabrera did not report any injuries to the police officer. (Lorick Decl. ¶ 15; Cabrera Dep. 65:24-66:15; Tr. at 44.) Following the accident, Cabrera drove the car he was operating to a nearby garage, approximately 10 to 15 minutes away from the scene of the accident. (Cabrera Dep. 70:10-13; Tr. at 44-45.) He then hailed a taxi cab to his home. (Cabrera Dep. 76:13-15.)

Cabrera testified that, prior to the August 7, 2015 accident, he did not have any problems with his neck or back. (Tr. at 14.) He further testified that, as a result of the accident, he had pain in his legs, back and neck. (*Id*. at 47.) In addition, Cabrera testified that, prior to the August 7, 2015 accident, he did not have any pain in either of his knees. (*Id*. at 96.) He further testified that he now has pain in his knees "[a]ll the time" and "[a]ll over," and the he takes Tylenol for the pain and applies a "jelly on [his] knees, like Bengay." (*Id*. at 33.) Cabrera stated that, for the first 30 days after the accident, other than going for medical visits, he was not doing any other activities, except that he "sometimes" would go for a walk. (Tr. at 20.) He lives on the fourth floor and there is no elevator in his building, so he needs to climb and descend four flights of stairs when he enters and leaves his building. (*See id*.)

---

[5] In the JPTO, Defendant designated certain pages and lines from Plaintiff's deposition transcript to be offered at trial. (*See* JPTO at 11-12.) The Court accepted such designations in evidence. (Tr. at 233.)

II.     **Plaintiff's Medical Condition**

A.      **Plaintiff's Medical Treatment**

On the evening of August 7, 2015 (the day of the accident), Cabrera took a taxi to St. Barnabas Hospital in the Bronx. (*See* Tr. at 46.) He complained of leg and back pain to the triage nurse (JX 4 at SBH00009-10 (St. Barnabas Records)), but left the hospital before being evaluated by a physician. (Tr. at 46.)

On August 8, 2015, Cabrera was seen at Bronx Lebanon Hospital, where he complained of back and leg pain arising from a rear-end motor vehicle collision the previous day. (*See* JX 5 at BL00017, 19, 22, 28, 30 (Bronx Lebanon Records); Pl.'s FOF ¶ 23; Def.'s FOF ¶ 17.) An x-ray of Cabrera's cervical spine taken that day showed mild degenerative changes with disc space narrowing at the C5-C6 level. (JX 5 at BL00034-35.) He was discharged home with a prescription for Ibuprofen (400 mg). (*Id*. at BL00020, 53.)

On August 14, 2015, Cabrera was seen by Glen Colodny, D.C., a chiropractor at Continental Medical, P.C., in the Bronx, New York, where he complained of "cervical pain, low back pain, thoracic pain, headaches, bilateral shoulder pain and left leg pain." (JX 6 at CM 00066 (Continental Medical records); *see* Pl.'s FOF ¶ 24; Def.'s FOF ¶ 19.) Cabrera was referred to a physiatrist and was recommended to ice areas of pain. (JX 6 at CM 00068.)

On August 25, 2015, Cabrera saw physiatrist DeLys St. Hill, M.D., at Continental Medical. (JX 6 at CM00078-81; *see* Def.'s FOF ¶ 21.) At that visit, Cabrera's chief complaints were: "Cervical/Neck pain," "Thoracic pain," "Low back pain with pain into the bilateral legs," "Bilateral shoulder pain" and "Headaches." (JX6 at CM00078.) Upon examination of Cabrera's lower extremities, Dr. St. Hill noted that, "All joints of the lower extremities show range of motion was

within normal limits. Palpation reveals no tenderness. Muscle testing was normal." (*Id*. at CM 00080.) Dr. St. Hill referred Cabrera to physical therapy and sent him for an MRI of the cervical and lumbar spine. (*Id*. at CM 00081.)

On August 26, 2015, Cabrera had a psychological exam by Steven Yellin, Ph.D., at Continental Medical. (JX 6 at CM 00056-58.) According to the notes from that visit, he reported that "that he sustained injuries to his neck, back and left leg." (*Id*. at CM 00058.)

On September 3, 2015, Cabrera was seen by Mark S. McMahon, M.D., having been referred by Charles E. Finelli, Esq. of Charles E. Finelli Associates (who is Plaintiff's counsel in this case). (*See* JX 7 at PDF pp. 00002 & 233 of 238 (McMahon Records);[6] Def.'s FOF ¶ 32; Tr. at 71.) At that visit, Cabrera stated that, during the accident, he sustained injuries to his right knee, neck and back. (JX 7 at PDF p. 139 of 238.) He complained of right knee pain, cervical spine pain and lumbar spine pain. (*Id*.) Dr. McMahon diagnosed Cabrera with "[r]ight knee patellar chondral injury with questionable torn meniscus" and "[c]ervical and lumbar injury." (*Id*.) Dr. McMahon ordered physical therapy and an MRI of Cabrera's right knee. (*See id*.)

On September 8, 2015, an MRI of Cabrera's lumbar spine was taken at Continental Medical. (JX 6 at CM 00108-09; *see* Def.'s FOF ¶ 22.) The radiologist's report states: "L4-L5 disc demonstrates loss of discal height and signal with moderate diffuse disc bulging with thecal sac compression and bilateral neural canal narrowing." (JX6 at CM 00109.)

---

[6] The version of JX 7 that was provided to the Court as a trial exhibit did not have page numbers on every page. However, at trial, Cabrera was shown an excerpt from JX 7 that contained page numbers on every page. (Tr. at 40-41.) The page numbers in that excerpt correspond to the pages of the PDF. Thus, the page in the excerpt cited above is page number 233, which also is page 233 of 238 of the PDF.

On September 15, 2015, an MRI of Cabrera's cervical spine was taken. (JX 6 at CM 00106-07; *see* Def.'s FOF ¶ 24.) The radiologist's report states that the C3-C4, C4-C5, C5-C6 and C6-C7 discs "demonstrate[] anterior and posterior disc herniation spur complexes measuring 5 mm with spinal stenosis."[7] (JX 6 at CM 00107.)

On September 17, 2015, Cabrera was seen by Jose A. Acevedo, M.D., at Continental Medical, who conducted a neurological examination. (JX6 at CM 00061-62; *see* Def.'s FOF ¶ 26.) Cabrera complained of "neck pain and lower back pain radiating to the upper and lower extremities, associated with numbness and paresthesias."[8] (JX6 at CM 00061.) During this visit, Cabrera underwent electromyogram (EMG) and nerve conduction velocity (NCV) studies of his upper and lower extremities, which were normal. (*See* JX 6 at CM 00059-60.)

On September 18, 2015, an MRI was done of both Cabrera's right knee and his left knee at Precision Imaging of New York. (*See* JX 8 at 00003-04 (Precision Imaging records); JX 7 at PDF pp. 138 & 142 of 238; *see* Pl.'s FOF ¶¶ 25, 27; Def.'s FOF ¶ 33.) According to the September 21, 2015 radiology report of the MRI of Cabrera's right knee, the radiologist interpreted the MRI as showing medial and lateral meniscal tears. (JX 8 at 00004.) According to the September 22, 2015 radiology report of the MRI of Cabrera's left knee, the radiologist interpreted the MRI as showing a medial meniscal tear and partial anterior cruciate ligament ("ACL") and medial collateral ligament ("MCL") tears. (*Id*. at 00003.)

---

[7] "Spinal stenosis . . . is defined as the narrowing of the lumbar or cervical spinal canal." *Sickler v. Colvin*, No. 14-CV-01411 (JCF), 2015 WL 1600320, at *9 (S.D.N.Y. Apr. 9, 2015).

[8] "Paresthesia is defined as a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet." *Agostini v. Comm'r of Soc. Sec.*, No. 13-CV-02175 (KAM), 2016 WL 8711392, at *4 n.8 (E.D.N.Y. Feb. 19, 2016) (quotation omitted).

On September 23, 2015, Cabrera was seen by Dr. Akhtar Ali at Continental Medical for pain management. (JX 6 at CM00104-05; *see* Def.'s FOF ¶ 27.) Cabrera complained of headaches, neck pain, low back pain, right shoulder pain, right knee pain and left knee pain. (JX6 at CM00104.) Dr. Ali diagnosed Cabrera with cervical and lumbar muscle spasms, cervicalgia[9] and myofascial pain syndrome.[10] (*Id*. at CM00105.)

On October 16, 2015, Cabrera had a left knee arthroscopy, performed by Dr. McMahon. (JX 7 at PDF p. 140 of 238; *see* Pl.'s FOF ¶ 26; Def.'s FOF ¶ 34.) According to Dr. McMahon's operating report, "upon inspection of the joint," he found a "tear of the medial meniscus anteriorly," "grade 2 chondral damage of the patella,"[11] "numerous loose bodies" and "inflamed synovial tissue."[12] (JX 7 at PDF p. 140 of 238.)[13]

---

[9] "Cervicalgia" is defined as "pain in neck." *Maldonado v. Berryhill*, No. 16-CV-00165 (JLC), 2017 WL 946329, at *5 n.10 (S.D.N.Y. Mar. 10, 2017) (quotation omitted).

[10] "Myofascial pain syndrome" is "[m]uscular pain in numerous body regions that can be reproduced by pressure on trigger points, localized hardenings in skeletal muscle tissue. Pain is referred to a location distant from the trigger points." *Crysler v. Astrue*, 563 F. Supp. 2d 418, 425 n.5 (N.D.N.Y. 2008) (quotation omitted).

[11] "Chondral knee injuries are the result of articular cartilage damage within the knee. Articular cartilage is a specific connective tissue covering joint surfaces that is important for smooth movement of the joint and allows the bones to move past each other without friction." The Steadman Clinic, *Articular Cartilage Damage*, http://drmillett.com/chondral-knee-injuries-articular-cartilage-damage/ (last visited Sep. 27, 2020). Grade II "will present a partial-thickness defect with fibrillation (shredded appearance) or fissures (depressions) on the surface that do not reach the bone or exceed 1.5 cm in diameter." *Id*.

[12] A synovial membrane is "the connective tissue [membrane] that lines the cavity of a synovial joint and produces the synovial fluid." *Moore v. Comm'r of Soc. Sec*., No. 13-CV-00168 (KPF) (GWG), 2014 WL 630589, at *2 (S.D.N.Y. Feb. 18, 2014) (quotation omitted). The knee is a synovial joint. *See Gordon v. Colvin*, No. 14-CV-01348 (VLB), 2017 WL 822796, at *3 (D. Conn. Mar. 2, 2017).

[13] On December 1, 2015, Cabrera underwent an examination by Eric Roth, M.D. (Def.'s Ex. B at AT 00589-93.) Among his diagnoses, Dr. Roth found that Cabrera's "cervical, thoracic and lumbar spine sprain/strain" was "resolved;" that his "bilateral shoulder sprain" was "resolved;" that his "right knee sprain" was "resolved;" and that his "left knee arthroscopic surgery" was "resolved." (*Id*. at AT 00592.) Dr. Roth's report was admitted into evidence at trial over Plaintiff's objection. (*See* Tr. at 229-31.) The Court did not rely on this report in reaching its decision in this case.

On January 15, 2016, Cabrera had a right knee arthroscopy, performed by Dr. McMahon. (JX 7 at PDF p. 131 of 238; *see* Pl.'s FOF ¶ 28; Def.'s FOF ¶ 35.) According to Dr. McMahon's operating report, when he "inspected" the knee joint, he found "tear[s] of the medial and lateral meniscus," "grade 2 chondral damage of the medial tibial plateau" and "inflamed synovial tissue." (JX 7 at PDF p. 131 of 238.)

On January 26, 2016, Cabrera visited Dr. St. Hill at Continental Medical. (JX 6 at CM00076-77; *see* Def.'s FOF ¶ 28.) Cabrera complained of "neck pain, mid and low back pain, headaches and bilateral shoulder pain." (JX 6 at CM00076.) Dr. Hill referred Cabrera "to Dr. Kaisman, Neurosurgeon, for cervical dis[c]ectomy versus epidural." (*Id*. at CM00077.) Cabrera saw Dr. St. Hill again on March 22, 2016, where Cabrera made the same complaints. (*See id*. at CM00072-73.)

On March 31, 2016, Cabrera was seen by Arden M. Kaisman, M.D. (JX 3 at 00003-04 (Kaisman Records); *see* Def.'s FOF ¶ 29.) Dr. Cabrera assessed Cabrera as having disc herniation at C3 through C7 with cervical radiculopathy[14] and myofascial pain syndrome that were "causally related to the motor vehicle accident of August 7, 2015." (JX 3 at 00004.) On June 3, 2016, Dr. Kaisman performed a cervical discectomy and decompression of the C4-C5 disc and C5-C6 disc. (*Id*. at 00007-09.)

On June 14, 2016, Cabrera once again saw Dr. St. Hill. (JX6 at CM00070-71; *see* Def.'s FOF ¶ 30.) Cabrera complained of "neck pain, mid and low back pain, headaches and bilateral shoulder pain." (JX6 at CM00070.) Dr. St. Hill's treatment plan was for Cabrera to continue a

---

[14] "Cervical radiculopathy is the clinical description of pain and/or neurological symptoms resulting from any type of condition that irritates a nerve in the cervical spine (neck)." *Annabi v. Berryhill*, No. 16-CV-09057 (BCM), 2018 WL 1609271, at *3 n.2 (S.D.N.Y. Mar. 30, 2018) (quotation omitted).

home exercise program, continue physical therapy one to two times per week and return for a reevaluation in 4 to 6 weeks. (*Id*. at CM00071.)

Based upon a note in the Continental Medical records, Cabrera was discharged from treatment on February 15, 2017. (JX6 at CM00086; *see* Def.'s FOF ¶ 30.)

**B.    Plaintiff's April 21, 2017 Accident**

In early 2017, Cabrera took a position as a janitor working for a maintenance company, IBS.[15] (JPTO, Stip. ¶ 21.) In that role, he was required to clean schools, including the classrooms and the bathrooms. (Tr. at 85.) As part of his duties, Cabrera had to lift bags of trash. (*Id*.) On April 21, 2017, Cabrera suffered a trip-and-fall accident while working as a janitor at IBS. (JPTO, Stip. ¶ 22.) Two days later, on April 23, 2017, Cabrera went to the Bronx Lebanon Hospital Emergency Department. (JX5 at BL00042-61; *see* Def.'s FOF ¶ 40.) In the emergency room, he denied neck pain, back pain and neurological deficits. (JX5 at BL00050.)

On May 12, 2017, Cabrera went to see Glen Colodny, D.C., the same chiropractor at Continental Medical who he had seen after his August 7, 2015 auto accident. (*See* JX6 at CM00014-16.) Cabrera complained that, since his April 21, 2017 accident, he had "cervical pain, low back pain, thoracic pain, headaches and right shoulder, arm, leg and knee pain and right hand and leg numbness." (*Id*. at CM00014.) Continental Medical's records in evidence reflect that Cabrera received further treatment relating to the April 21, 2017 accident through January 2019. (*See id*. at CM00025.)

---

[15] Cabrera had returned to work as a taxi driver approximately six months after the August 7, 2015 motor vehicle accident and continued to work as a taxi driver until December 2016. (*See* Tr. at 29, 81-82.)

Between December 2017 and March 2018, Cabrera also received treatment from Dr. Aditya Patel and Dr. Sukeb Datta related to his April 21, 2017 accident, including cervical epidural steroid injections. (*See* Def. Ex. D at DATTA00001-43.) In addition, in January 2018, Dr. McMahon performed surgery on Cabrera's right shoulder and, in October 2018, Dr. McMahon performed surgery on Cabrera's left shoulder. (*See* JX 7 at PDF pp. 48 to 49 & 84 to 85 of 238; *see also* JX2 at FASC00001-109.)

### C.   Plaintiff's Expert Medical Testimony

Dr. McMahon testified live at the trial.[16] About 80 percent of his practice as an orthopedist is devoted to treating individuals who have been in a motor vehicle accident, a trip-and-fall accident or sustained an injury at work. (*See* Tr. at 123.) Some of his patients are referred by personal injury attorneys, including Plaintiff's counsel in this case. (*See id*.) Cabrera was referred to Dr. McMahon by Plaintiff's counsel. (*See id*.)

Dr. McMahon opined that the cause of the neck injury for which Cabrera received surgery in June 2016 was the August 7, 2015 motor vehicle accident. (Tr. at 117.) However, the Court gives very little weight to Dr. McMahon's opinions regarding Cabrera's spine since he only treated Cabrera for his alleged injuries to his knees, and Dr. McMahon has no specialized training relating to the spine. (*See id*. at 123-24.) Rather, if Dr. McMahon sees a patient who has a serious spine injury, he testified that he refers that patient to a spine specialist. (*See id*. at 124-25.)

Dr. McMahon, who had begun treating Cabrera on September 3, 2015 (*see* Findings of Fact, Section II.A., *supra*) opined at trial that the cause of the injuries to Cabrera's knees was the

---

[16] Dr. McMahon was a hybrid fact/expert witness since he both treated Plaintiff and offered his expert opinion at trial.

motor vehicle accident of August 7, 2015. (Tr. at 116-17.) He stated that a rear end accident can cause tears of the medial meniscus and lateral meniscus. (Id. at 119.) Dr. McMahon explained that, "when the impact occurs if there is a rotation externally, that twists the knee." (Id.) He further explained that "if the knee hits into something and the tibia pushes back into the femur, that could tear [the meniscus] also." (Id.)

Dr. McMahon also testified regarding his assessment and treatment of Cabrera's knee injuries, including his decision to perform arthroscopic surgery on both knees, and his findings during surgery. On direct examination, Dr. McMahon testified that at his first visit with Cabrera on September 3, 2015, he referred Cabrera for MRIs of both knees and, after reviewing the films, concluded that Cabrera needed to have arthroscopic surgery on both knees.[17] (*See* Tr. at 101, 104-05.) However, Dr. McMahon's executed medical record from September 3, 2015 reflects that Dr. McMahon did not examine Cabrera's left knee during the September 3, 2015 visit and that he only ordered an MRI of Cabrera's right knee. (*See* JX 7 at PDF p. 139 of 238.) Dr. McMahon's September 3, 2015 medical record was prepared from a template form that he completed in his handwriting. (*See* Tr. at 158-66.) That form makes clear that Dr. McMahon did not examine Cabrera's left knee and that he only ordered an MRI of the right knee. (*See* Def. Ex. B at AT 00425.)[18]

---

[17] The Court also notes that, in the narrative that Dr. McMahon sent to Plaintiff's counsel on March 28, 2019, he states that the "PLAN" after Cabrera's visit included "obtain[ing] an [sic] MRI's of his knees. (See JX 7 at 3.)

[18] The page numbered AT 00425 in Defendant's Exhibit B was accepted into evidence at trial. (*See* Tr. at 232.)

When asked by me about why he ordered an MRI, and later operated, on Plaintiff's left knee after he had examined only Plaintiff's right knee, Dr. McMahon speculated that, due to a "language barrier," he "concluded that it was only the right knee," and that "when [Plaintiff] went out to talk to [his Spanish-speaking] secretaries," they ordered an MRI of the left knee (in addition to the right knee). (*See* Tr. at 203.) Dr. McMahon's claim—that it was one of his secretaries who ordered the MRI of Cabrera's left knee—not only contradicts his prior testimony, but it defies credulity. A secretary does not have the medical training or authority to make decisions regarding a patient's treatment. If indeed one of Dr. McMahon's Spanish-speaking secretaries had learned of an issue with Plaintiff's left knee while speaking with Plaintiff, and realized that this was something that Dr. McMahon had missed, it is much more likely that he or she would have told Dr. McMahon about it, and Dr. McMahon would have examined Plaintiff's left knee before ordering an MRI.

Moreover, Dr. McMahon expressed surprise that he did not examine Cabrera's left knee at the first visit and explained that he must not have understood what Cabrera was saying. (*See* Tr. at 203.) The Court finds Dr. McMahon's suggestion that he did not examine Cabrera's left knee due to communication difficulties unpersuasive and, again, contradictory of his prior testimony that he ordered MRIs on both knees. In any event, Dr. McMahon does not explain why, even after reviewing the MRI, he never examined Cabrera's left knee prior to performing surgery. (*See id*. at 168-69.)

Also, when asked about his decision to perform surgery, Dr. McMahon testified on direct examination that he performed arthroscopic surgery on Plaintiff's left knee, which surgery occurred on October 16, 2015, because physical therapy "didn't really help him enough." (Tr. at

14

108, 149.) This explanation also is not credible. The records show that, during the period from August 28, 2015 through September 28, 2015, Plaintiff had physical therapy on other parts of his body, but had no therapy on either of his knees. (Def.'s Ex. A at WCB01178-87, 1207-08.) The first time Plaintiff had physical therapy on his left knee was on September 30, 2015. (*Id.* at WCB01182.) Then, it was only two days later, on October 2, 2015, that Dr. McMahon received a fax from Plaintiff's counsel stating that "medical clearance was needed" for "L/ knee surgery" on "10-16-15." (*See* JX 7 at  PDF p. 229 of 238.)

In sum, I find Dr. McMahon's testimony regarding Plaintiff's left knee, which is a central issue in this case, to be highly suspect.[19] This causes me to conclude that Dr. McMahon is not a credible witness.

**D.**     **Defendant's Medical Expert Testimony**

Joseph A. Bosco III, M.D. offered testimony on behalf of the United States in the field of orthopedics. (Bosco Decl. ¶¶ 1-57.)[20] To prepare for his testimony, he conducted an examination of Plaintiff. (*See id.* ¶¶ 11, 31-38.) Dr. Bosco also reviewed medical records and the deposition testimony of Plaintiff and Dr. McMahon. (*Id.* ¶¶ 9-10.) Dr. Bosco gave his expert opinion that the injuries to Plaintiff's knees were not caused by the August 7, 2015 motor vehicle accident. (*See id.* ¶¶ 12, 47-53.) Dr. Bosco explained that the mechanism of injury caused by a rear-end collision was inconsistent with the injuries that Dr. McMahon claims occurred to Cabrera's right and left

---

[19] All the foregoing discussion of Dr. McMahon's treatment of Plaintiff's left knee is in the context of credible testimony from Defendant's expert (based upon images in evidence) that the surgery performed on Plaintiff's left knee was unnecessary. (*See* Findings of Fact Section II.D., *infra*.)

[20] Dr. Bosco's Declaration was accepted into the record as direct testimony from him. (Tr. at 242.) His direct testimony was supplemented by in-court testimony regarding MRIs and other images of Cabrera's knees. (*See id.* at 242-64.)

knees. First, "acute or traumatic meniscal and ligament tears [as were present in Cabrera's right knee] are caused by twisting and/or hyperflexing[21] of the knee, neither of which occurs from being rear-ended in a car accident." (*Id*. ¶ 50.) Second, even if there were tears to the ACL and MCL in Cabrera's left knee (which Dr. Bosco disputes), "the mechanism of injury during the car accident does not cause injury to these ligaments, as tears to the ACL and MCL are caused by twisting or hyperflexing of the knee or direct trauma to the inside of the knee, often in sports, which does not occur in a rear-end accident." (*Id*. ¶ 52.) During cross-examination at trial, however, Dr. Bosco conceded that if, in a rear-end accident, a patient had his foot on the brake and twisted his knee, which then hit the dashboard, it was "possible" that this could cause a meniscus tear. (Tr. at 319.)

Dr. Bosco also opined that the injuries described by Dr. McMahon "are ones which are completely alleviated by arthroscopy and do not go on to cause post-traumatic arthritis," and that "Plaintiff will not require any further treatment to his knees, either surgical or non-surgical, as a result of [the] motor vehicle accident." (*See* Bosco Decl. ¶ 12.)

Dr. Bosco took issue with certain of the findings contained in the radiology reports that were prepared based upon the MRIs of Plaintiff's knees, as well as certain of the findings reflected in Dr. McMahon's operating reports. (*See* Tr. at 244-61.) In addition, Dr. Bosco testified, after reviewing the images in evidence, that the surgery performed on Plaintiff's left knee was not necessary. (*See id*. at 253-54.)

---

[21] At trial, Dr. Bosco indicated that he wished to change "hyperflexing" to "hyperextending." (Tr. at 318.)

I find Dr. Bosco to be a credible witness. His answers were clear and direct and he was not evasive in the face of cross-examination. Indeed, as noted above, Dr. Bosco made a significant concession on cross-examination regarding how a tear might occur in a driver's meniscus as a result of a rear-end collision.

Charla R. Fischer, M.D. also offered testimony on behalf of the United States in the field of orthopedics. (Fischer Decl. ¶¶ 1-72.)[22] To prepare for her testimony, she conducted an examination of Plaintiff. (*See id*. ¶¶ 12, 34-45.) Dr. Fischer also reviewed medical records and the deposition testimony of Plaintiff. (*Id*. ¶¶ 9-11.) Dr. Fischer gave her expert opinion that "Plaintiff was in a low-impact motor vehicle accident in which his vehicle was rear-ended on August 7, 2015," and that "[a]ssuming Plaintiff's complaints of pain are true, he developed a mild neck and lower back muscle strain, which typically completely resolve in no more than three to six months." (*Id*. ¶ 13.)

I find Dr. Fischer to be a credible witness. Like Dr. Bosco, her answers were clear and direct and she was not evasive in the face of cross-examination.

### PRELIMINARY MATTERS

Before turning to its conclusions of law based upon the trial record, the Court addresses certain preliminary matters.

### I.   Direct Testimony By Declaration

In its Order, dated May 1, 2020, the Court stated that it "will proceed by accepting direct testimony by sworn statement," and invited "any party that wishes to present direct testimony

---

[22] Dr. Fischer's Declaration was accepted into the record as direct testimony from her. (Tr. at 330.) Her direct testimony was supplemented by in-court testimony regarding images of Cabrera's spine. (*See id*. at 330-59.)

through live testimony, rather than by affidavit, to raise their request with the Court . . . no later than one month prior to the date established for the submission of the joint pretrial order." (5/1/20 Order, ECF No. 50, at 2.) Thus, the deadline for Plaintiff to request live testimony expired on August 21, 2020. However, it was not until Friday, September 18, 2020, that Plaintiff raised for the first time with the Defendant his desire to proceed by live testimony and this issue was not raised with the Court until submission of the proposed Joint Pretrial Order on Monday, September 21, 2020. (*See* Proposed JPTO, ECF No. 57, at 9-10.)

Rule 43(a) of the Federal Rules of Civil Procedure provides that "[a]t trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise." Fed. R. Civ. P. 43(a). However, in *Ball v. Interoceanica Corp.*, 71 F.3d 73 (2d Cir. 1995), the Second Circuit approved "the procedure allowing the parties to produce direct evidence from their witnesses in writing while permitting subsequent oral cross-examination—particularly when the parties agree to that procedure in advance." *Id*. at 77. Although the Court believes that the procedure it had put in place is consistent with Second Circuit precedent, out of an abundance of caution, the Court did impose this procedure on Plaintiff's witnesses, but permitted Plaintiff's witnesses to testify live on direct examination.[23] In addition, the Court offered Defendant the opportunity to have Defendant's witnesses testify live on direct examination.

---

[23] The Court finds that, with respect to having certain of Defendant's witnesses' direct testimony being accepted into evidence through sworn declarations, the Court finds that Plaintiff waived any right he had to object to this procedure. In any event, Plaintiff is not prejudiced by this procedure because he had the opportunity to thoroughly cross-examine Defendant's witnesses at trial. Indeed, Plaintiff likely benefited from this procedure since he had the written direct testimony of Defendant's witnesses two weeks before trial, which gave Plaintiff a lengthy period in which to prepare for the cross-examinations.

At trial, Defendant's witnesses presented their testimony by sworn declarations which were accepted into evidence. In addition, as set forth above, Defendant's two experts gave live direct testimony about MRIs and other images of Plaintiff's knees and spine. Plaintiff's counsel thereafter cross-examined Defendant's expert witnesses.[24] I find that this procedure, which was efficient and also offered me ample opportunity to assess the credibility of Defendant's witnesses, was appropriate in the circumstances of this case where I am the trier of fact. *See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC, No. 04-CV-09651 (KNF), 2010 WL 2365866, at *4 (S.D.N.Y. June 2, 2010) ("By employing this method, the Court construed Fed.R.Civ.P. 43(a), *see* Fed.R.Civ.P. 1, and applied Fed. Evid. 611(a) to ensure that: (1) an efficient and economical trial would be afforded the parties; (2) testimony would be elicited effectively; and (3) the Court would be able to observe each witness' demeanor, under cross-examination, and, thereby, make reasonable credibility determinations.").

## II.     Defendant's *In Limine* Motion

On September 21, 2020, Defendant timely filed an *in limine* motion seeking to (A) preclude Plaintiff from introducing evidence of an alleged injuries to his left knee, and (B) seeking to preclude Plaintiff's Dr. McMahon from offering any expert opinion testimony concerning Plaintiff's alleged spinal injuries. (Def.'s In Limine Mem., ECF No. 59, at 1-10.)

### A.    Plaintiff's Left Knee Injuries

Defendant sought to preclude Plaintiff from offering evidence at trial regarding injuries to his left knee on the ground that the injuries were not exhausted as required under 28 U.S.C. § 2675. (Def.'s In Limine Mem. at 1-3.) Defendant noted that Plaintiff's administrative claim, Form

---

[24] Plaintiff declined to cross-examine Lorick at trial. (Tr. at 239.)

SF-95, asserted only that he had suffered injuries to his "neck, back and right knee," and did not allege any injury to Plaintiff's left knee. (Levine Decl., Ex. 1, ECF No. 62-1.)[25] Thus, Defendant argued that the SF-95, as filed, did not provide the United States a reasonable opportunity to investigate any injuries to Plaintiff's left knee and to expedite the fair settlement of claims arising from any such injuries. (Def.'s In Limine Mem. at 2.)

In response, Plaintiff argued that his "Administrative Claim package served upon the Government on or about July 31, 2017, contained numerous documents pertaining to injuries to plaintiff's left knee . . .." (Finelli Aff., ECF No. 65, ¶ 12 (emphasis omitted).) He further argued that Defendant should be precluded by the doctrines of waiver and/or estoppel from arguing that Plaintiff's left knee is not part of this case since Defendant took substantial discovery regarding Plaintiff's left knee. (*See id*. ¶¶ 18-26.)

Although the Court had doubts regarding whether the Court had jurisdiction to consider Plaintiff's claims based upon injuries to his left knee, and therefore whether evidence regarding his left knee was relevant, the Court denied this aspect of Defendant's *in limine* motion without prejudice and reserved decision on the jurisdictional question until after trial. Thus, Plaintiff was permitted to introduce evidence at trial regarding his left knee injuries. *See Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir. 1977) (noting that ordinarily it is more prudent course in bench trial to admit into evidence doubtfully admissible evidence).

Now, having carefully considered the issue, I conclude that I do not have jurisdiction to consider Plaintiff's claims based upon injuries to his left knee. Before filing suit under the FTCA,

---

[25] A complete copy of Plaintiff's Form SF-95, including all the medical records attached thereto, is contained in Plaintiff's Exhibit 1, which was accepted into evidence at trial. (Tr. at 6.)

a plaintiff must first present an administrative claim to the relevant agency. 28 U.S.C. § 2675(a).

The administrative exhaustion requirement is "jurisdictional and cannot be waived." *Celestine v.*

*Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005); *accord Mayes v. United*

*States*, 790 F. App'x 338, 339 (2d Cir. 2020).[26] An administrative claim under the FTCA must

"provide sufficient information both to permit an investigation and to estimate the claim's

worth." *Keene Corp. v. United States*, 700 F.2d 836, 842 (2d Cir. 1983). This requirement "serve[s]

the purpose of the FTCA to enable the federal government to expedite the fair settlement of tort

claims." *Romulus v. United States*, 160 F.3d 131, 132 (2d Cir. 1998).

In *Guthrie v. U.S. Fed. Bureau of Prisons*, No. 09-CV-00990 (LAP), 2010 WL 2836155

(S.D.N.Y. July 7, 2010), *aff'd*, 421 F. App'x 120 (2d Cir. 2011), the Form SF-95 submitted by an

inmate who brought an FTCA claim against the United States "did not list any injuries besides his

hair loss."[27] *Id.* at *4. Judge Preska dismissed for lack of subject matter jurisdiction "all common

law tort claims other than the claim relating to hair loss." *Id.* at *5. The Second Circuit affirmed

for "substantially the same reasons stated by the district court in its thorough and well-reasoned

memorandum and order." *Guthrie*, 421 F. App'x at 120.

In the present case, the SF-95 form asserted only that Plaintiff had suffered injuries to his

"neck, back and right knee," and did not allege any injury to Plaintiff's left knee. (Levine Decl., Ex.

1.) The fact that the enclosures to the SF-95 form contained mention of injuries to Plaintiff's left

---

[26] "The objection that a federal court lacks subject-matter jurisdiction, *see* Fed. Rule Civ. Proc. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

[27] In the Form SF-95, plaintiff Guthrie had stated that he "suffered permanent hair loss as the result of having been denied the drug Propecia," but did not list any other injuries. (*Guthrie v. U.S. Fed. Bureau of Prisons*, Second Circuit Court of Appeals Docket No. 10-3068, Doc. 36, at DA-36.)

knee is not sufficient, in the Court's view, to put the United States on notice that Plaintiff was

seeking to recover damages for such injuries. The enclosures that Plaintiff submitted were over

300 pages in length and the Court finds that it was not incumbent on the United States to hunt

through the enclosures to seek to determine the injuries for which Plaintiff was making a claim.

Here, as in *Guthrie*, because claims relating to injuries to Plaintiff's left knee were not listed in

Plaintiff's SF-95 form, the Court finds that it does not have subject matter jurisdiction over such

claims.[28]

    **B. Dr. McMahon's Testimony Regarding Plaintiff's Alleged Spinal Injuries**

Defendant sought to preclude Dr. McMahon from testifying about Plaintiff's alleged

spinal injuries because he "did not form reliable, nonconclusory medical expert opinions

regarding Plaintiff's alleged spinal injuries," as opposed to Plaintiff's alleged knee injuries. (*See*

Def.'s In Limine Mem. at 6-7.) Plaintiff responded that Dr. McMahon's expert witness disclosure

(Levine Decl. Ex. 2, ECF No. 62-2) "sets forth the conclusions and opinions about which he will

testify at trial, including those which pertain to plaintiff's neck and back." (Finelli Aff. ¶ 29

(emphasis omitted).)

I denied this aspect of Defendant's *in limine* motion, finding that it was the better course

for me to hear Dr. McMahon's testimony at trial and then decide what weight, if any, to give it.

*See Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.*, No. 09-CV-05935, 2011 WL 3874878,

at *2 (S.D.N.Y. Aug. 31, 2011) ("When the fact-finder is the court, expert evidence should be quite

---

[28] In any event, as discussed below, even if the Court had subject matter jurisdiction regarding injuries to Plaintiff's left knee, the Court finds that Plaintiff has not proven by a preponderance of the evidence that any injuries to his left knee were proximately caused by the August 7, 2015 accident or that such injuries were serious.

freely admitted so that the judge may have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions." (internal quotation marks and citation omitted)).

Having reviewed the evidence and assessed Dr. McMahon's credibility, I give very little weight to his opinions regarding Plaintiff's neck and back. (*See* Findings of Fact Section II.C., *supra*.)

## CONCLUSIONS OF LAW

### I.     Legal Standards

Under the FTCA, the United States is liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Because the accident in question occurred in the Bronx, New York, the laws of New York State and New York City govern the issues of liability and damages in this action. *See, e.g., Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988); *Holland v. United States*, 918 F. Supp. 87, 89 (S.D.N.Y. 1996). To establish that a defendant acted negligently under New York law, the plaintiff must establish three elements by a preponderance of the evidence: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985); *see Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 177 (2d Cir. 2013). Under New York law, the burden is on the plaintiff to

prove, by a preponderance of the evidence, that he is entitled to a damages award. *See Craig Test Boring Co., Inc. v. Saudi Arabian Airlines Corp.*, 138 F. Supp. 2d 553, 557 (S.D.N.Y. 2001).

Under New York's so-called "no-fault" automobile insurance law[29] there is "no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss."[30] N.Y. Ins. Law § 5104(a). A "serious injury" is defined by statute as "a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment." *Id.* § 5102(d).

The New York Court of Appeals has held that "to qualify as a serious injury within the meaning of the statute, 'permanent loss of use' must be total." *Oberly v. Bangs Ambulance Inc.*, 96 N.Y.2d 295, 298 (2001). Whether the limitation on the use of a body function is "permanent" or "significant" requires a determination of the qualitative nature of the injury in relation to the use of the body part. *Toure v. Avis Rent A Car Sys., Inc.*, 98 N.Y.2d 345, 353 (2002). A "minor, mild or slight limitation" does not qualify as a serious injury. *Licari v. Elliot*, 57 N.Y.2d 230, 236 (1982).

---

[29] New York's "no-fault" law was enacted in part to "weed out frivolous claims and limit recovery to significant injuries." *Dufel v. Green*, 84 N.Y.2d 795, 798 (1995).

[30] The parties have stipulated that Plaintiff is not seeking any damages for lost income, past medical expenses or property damage. (JPTO, Stip. ¶ 19.) In addition, at the conclusion of the trial, Plaintiff's counsel stated that Plaintiff was not seeking any damages other than $300,000 for past and future pain and suffering. (Tr. at 466.) Thus, economic loss is not addressed in my Opinion and Order.

A plaintiff's mere subjective reports of pain, numbness or other symptoms are not sufficient to demonstrate "serious injury." *Toure*, 98 N.Y.2d at 350 ("[W]e have required objective proof of a plaintiff's injury in order to satisfy the statutory serious injury threshold; subjective complaints alone are not sufficient." (citations omitted)). Those medical diagnoses which rely on subjective reporting of symptoms "may fall short of the kind of objective medical evidence necessary to establish serious injury under New York law." *Williams v. United States*, 597 F. App'x 647, 649 (2d Cir. 2015) (citing *Toure*, 98 N.Y.2d at 351)). Similarly, the plaintiff must submit medical reports detailing the injury based on objective medical determinations. *Toure*, 98 N.Y.2d at 353 (citation omitted).

"Objective medical evidence can include diagnostic tests (such as an EMG or MRI), or a numeric assessment of lost range of motion." *Madden v. Lee*, No. 01-CV-07856 (GWG), 2002 WL 31398951, at *4 (S.D.N.Y. Oct. 25, 2002) (internal citations omitted). New York courts have generally found that injuries such as bulging discs and tears in tendons and/or ligaments are not sufficient evidence to establish a serious injury when unaccompanied by "objective evidence of the extent of the alleged physical limitations resulting from the injury and its duration." *Little v. Looch*, 71 A.D.3d 837, 838 (N.Y. App. Div. 2d Dep't 2010). The burden of proof is on the plaintiff to show he has suffered a serious injury. *Krynski v. Chase*, No. 06-CV-04766, 2016 WL 1029498, at *4 (E.D.N.Y. Mar. 8, 2016), *aff'd*, 677 F. App'x 24 (2d Cir. 2017) (citing *Narumanchi v. Am. Home Assur. Co.*, 317 F. App'x 56, 58 (2d Cir. 2009)).

The Court has discretion to determine the credibility of the testimony of the Plaintiff and any medical experts regarding the Plaintiff's injuries. *See Williams*, 597 F. App'x at 648-49.

II.   **Defendant's Negligence**

The Court finds that, based upon the stipulated facts, Plaintiff has established that Defendant owed a duty to him and that it breached that duty.[31] (*See* JPTO, Stip. ¶ 20.) However, the Court finds that Plaintiff has not proven by a preponderance of the evidence that all of his alleged injuries were proximately caused by the August 7, 2015 accident. *See Dershowitz v. United States*, No. 12-CV-08634 (SN), 2015 WL 1573321, at *23 (S.D.N.Y. Apr. 8, 2015) ("plaintiff bears the burden of proving by a preponderance of the evidence that the injuries in question were proximately and substantially caused by the defendant's negligence"). Specifically, Plaintiff has not met his burden of proof to show that any knee injuries were proximately and substantially caused by the August 7, 2015 accident.

Based upon its examination of the evidence, the Court credits Lorick's testimony that the impact of the collision was "relatively light." (Lorick Decl. ¶ 10.)[32] Her testimony that, before the accident occurred, she had been stopped behind Plaintiff's vehicle at a red traffic signal is supported by the statements attributed to Plaintiff in the police report that Plaintiff himself put into evidence.[33] (*See* Pl.'s Ex. 1 at PDF p. 5.) Since Lorick was starting from a standing stop, her vehicle could not have built up much speed before Plaintiff stopped short in front of her and she ran into him. Thus, Lorick's estimate that she was traveling about five miles per hour and that the

---

[31] Defendant admits that it, through its employee, Lorick, failed to exercise reasonable care on August 7, 2015, when the vehicle Lorick was driving came into contact with the rear of the vehicle driven by Cabrera while both vehicles were at or near a traffic light at the intersection of Louis Nine Boulevard and Boston Road, in the Bronx, New York. (JPTO, Stip. ¶ 20.)

[32] As noted earlier, Plaintiff chose not to cross-examine Lorick and left her direct testimony, as set forth in her Declaration, unchallenged. (*See* Tr. at 239.)

[33] The accident report that was submitted as a joint exhibit, *i.e.*, JX 1, which is different from the report contained in Plaintiff's Exhibit 1, does not contain statements attributable to the two drivers.

impact was "relatively light" (Lorick Decl. ¶¶ 9-10) is credible. Moreover, Lorick's testimony is supported by the fact that the air bags in her vehicle did not deploy, even though she had a front-end collision. (*See id*. ¶ 10.) Her testimony also is supported by my review of the photographs of the damaged vehicles. (JX 10, JX 11.) A "relatively light" collision to the rear of a vehicle in which the driver was wearing a seat belt would not have caused the types of injuries to a driver's knees that Plaintiff is alleging here.

In addition, the Court credits Dr. Bosco's opinion that the injuries to Plaintiff's knees were not caused by the August 7, 2015 motor vehicle accident and does not credit Dr. McMahon's opinion to the contrary. Based upon the manner in which the accident occurred, the Court finds Dr. Bosco's testimony that Plaintiff's knee injuries were not caused by the August 7, 2015 accident to be persuasive. (*See* Bosco Decl. ¶ 47.)

Equally important is the fact that, during the three weeks following the accident, when he went to seek medical treatment, Cabrera did not complain about his knees. (*See*, *e.g*., JX 4 at SBH0009-10; JX 5 at BL00017, 19, 22, 28, 30; JX 6 at CM 00014, 56-58, 78-81.) It was only on September 3, 2015, when Cabrera was referred to Dr. McMahon by his lawyer that he complained of knee pain, but even then he complained only of pain to his right knee, not his left. (*See* JX 7 at PDF p. 139 of 238.) Cabrera never complained about pain in his left knee until September 23, 2015. (*See* JX 6 at CM00104-05.) If there was an impact, as Plaintiff claims, that sounded "like a bomb" (Tr. at 12), and his knees hit the dashboard during the impact, then surely he would have experienced pain that he would have mentioned when he went to seek medical treatment.

Thus, the Court finds that Plaintiff has not met his burden of proof to show that his knee injuries were proximately caused by the accident.[34] The Court finds, however, that Plaintiff has met his burden of proof to show that back and neck injuries were proximately caused by the August 7, 2015 accident. I make this finding based upon how the accident occurred, as well as my review of the medical records from St. Barnabas Hospital and Bronx Lebanon Hospital. As Defendant's Dr. Fischer admits, Plaintiff developed neck and back injuries as a result of the accident. (*See* Fischer Decl. ¶ 71.)

## III.    Whether Plaintiff Suffered A "Serious Injury" In The Accident

The Court next addresses whether Plaintiff suffered a "serious injury" under the New York Insurance Law. The parties stipulated in the Joint Pretrial Order that Plaintiff did not suffer death; dismemberment; loss of a fetus; or permanent loss of use of a body organ, member, function, or system as a result of the August 7, 2015 motor vehicle accident. (JPTO, Stip. ¶ 15.)

Plaintiff contends that he sustained a "serious injury," as defined in Section 5102(d) of the New York State Insurance Law, as a consequence of the August 7, 2015 accident, in four ways. First, Plaintiff alleges he sustained a "permanent consequential limitation of use of a body organ or member and a significant limitation of use of a body function or system." (Pl.'s Conclusions of Law ("Pl.'s COL"), ECF No. 60, ¶ 23.) Second, Plaintiff alleges he sustained a "significant limitation of use of a body function or system." (*Id*. ¶ 24.) Third, Plaintiff alleges that he sustained a "fracture." (*Id*. ¶ 26.) Fourth, Plaintiff alleges that he sustained a "medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing

---

[34] Even if Plaintiff's knee injuries were proximately caused by the August 7, 2015 accident, the Court finds that such injuries do not qualify as "serious" under New York law. (*See* Conclusions of Law Section III, *infra*.)

28

substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment."[35] (*Id*. ¶ 27.)

### A.    No Permanent Consequential Limitation Of Use Of A Body Organ Or Member

The "permanent loss of . . . a body function" does not involve the element of significance, but only that of permanence. *Miller v. Miller*, 100 A.D.2d 577, 577 (N.Y. App. Div. 2d Dep't 1984). To establish a serious injury based on permanent consequential limitation of use of a body organ or member, a plaintiff must "produce competent medical evidence that [his] injuries are permanent." *Ventra v. United States*, 121 F. Supp. 2d 326, 333 (S.D.N.Y. 2000). Such a claim of permanence "must be supported by medical records and not based solely on plaintiff's testimony and subjective descriptions of pain." *Jones v. United States*, 408 F. Supp. 2d 107, 117 (E.D.N.Y. 2006). "Subjective complaints of pain do not suffice." *Ventra*, 121 F. Supp. 2d at 333.

Plaintiff has not met his burden of proof to show a serious injury based on permanency. With respect to his spine, Plaintiff has not met his burden of proof to show that Plaintiff has any permanent injuries that were caused by the August 7, 2015 accident.[36] Plaintiff did not even proffer an expert witness who was qualified to testify as to Plaintiff's spinal injuries. As set forth earlier, the Court gives very little weight to Dr. McMahon's opinions regarding Cabrera's neck and spine since he only treated Cabrera for his alleged injuries to his knees and Dr. McMahon has no specialized training relating to the spine. (*See id*. at 123-24.) Indeed, if Dr. McMahon sees a

---

[35] During trial, Plaintiff withdrew his contention (Pl.'s COL ¶ 25) that he sustained a "significant disfigurement." (Tr. at 466.)

[36] To the contrary, the medical records reflect that Plaintiff was discharged from treatment for his spine on February 15, 2017. (*See* JX 6 at CM00086.)

patient who has a serious spine injury, he testified that he refers that patient to a spine specialist. (*See id*. at 124-25.)

In addition, Plaintiff has not met his burden of proof to show that his knee injuries were permanent.[37] I credit the testimony of Dr. Bosco that Plaintiff will not need any further treatment for his knees. (*See* Bosco Decl. ¶ 57.) As elicited by Plaintiff's own counsel on cross-examination of Dr. Bosco, following the operations by Dr. McMahon, "there's no meniscus tear" and "there's no weakness in the ACL." (*See* Tr. at 326-27.) Further, as set forth above, because I find that Dr. McMahon was not a credible witness, his testimony that went to the issue of permanence was heavily discounted by me.

### B.      No Significant Limitation Of Use Of A Body Function Or System

A "significant limitation of use of a body function does not require permanence, but instead requires a fact finding on the issue of whether the dysfunction is important enough to reach the level of significance." *Jones v. United States*, 408 F. Supp. 2d 107, 119 (E.D.N.Y. 2006) (quoting *Miller v. Miller*, 100 A.D.2d 577, 578 (N.Y. App. Div. 2d Dep't 1984)). A "minor, mild or slight limitation of use" of a body function or system does not constitute a "significant limitation" under New York law. *Licari v. Elliott*, 57 N.Y.2d 230, 236 (1982). As with a claim based on permanency, claims of serious injuries based on the significance of a plaintiff's limitation must be objectively measured and supported by credible medical evidence. *See Ventra v. United States*, 121 F. Supp. 2d 326, 333-34 (S.D.N.Y. 2000). "A plaintiff's description of his pain and suffering, standing alone without other objective indicia, cannot support a claim of significant limitation."

---

[37] The Court took note that, although Plaintiff's counsel spent considerable time cross-examining Defendant's experts about images of Plaintiff's knees (and spine), they chose not to have Plaintiff's expert, Dr. McMahon, testify about what the images showed regarding Plaintiff's injuries.

*Jones*, 408 F. Supp. 2d at 119. Additionally, a plaintiff must prove a significant limitation "in both degree and duration." *Gualtieri v. Farina*, 283 F. Supp. 2d 917, 925 (S.D.N.Y. 2003).

The Court finds that Plaintiff has not met his burden of proof to show a significant limitation of use of a body function or system. Based upon the Court's review of the evidence, Plaintiff has not shown significant limitations with respect to his spine that were caused by the August 7, 2015 accident, and failed to even proffer an expert witness who was qualified to testify as to Plaintiff's spinal injuries. Moreover, the Court credits the testimony of Dr. Fischer that Plaintiff's spinal injuries from the accident were not significant. (*See* Fischer Decl. ¶¶ 71-72.)

The Court also finds that Plaintiff has not met his burden of proof to show significant limitations to Plaintiff's knees. Again, I credit the testimony of Dr. Bosco and find Dr. McMahon not credible.

### C.      Fracture

The Court finds no credible evidence that Plaintiff sustained a fracture as a result of the August 15, 2017 accident. Dr. McMahon made no mention of any fractures during his testimony. Nor did Plaintiff's counsel make any mention of a fracture during his summation. Moreover, Dr. Fischer testified that there she observed no fractures in the records she reviewed. (Tr. at 338, 342, 346, 404.) Thus, Plaintiff has not met his burden of proof.

### D.      90/180 Day Medically Determined Injury Or Impairment Of Non-Permanent Nature

"There has been substantial litigation interpreting this 90/180 day 'serious injury' cause of action." *Escoto v. United States*, 848 F. Supp. 2d 315, 330 (E.D.N.Y. 2012). The statutory words "substantially all" have been interpreted to mean "that the person has been prevented from performing his usual activities to a great extent, rather than some slight curtailment." *See id*.

(citing *Thompson v. Abbasi*, 15 A.D.3d 95, 100, 101 (N.Y. App. Div. 1st Dep't 2005)). "Further, in this type of no fault 'serious injury' case, the plaintiff must submit competent medical evidence to support [his] claim that [he] was unable to perform substantially all of [his] daily activities for not less than 90 of the 180 days immediately following the accident, as a result of the subject accident." *Id*. (citing cases). "The plaintiff's allegations that [his] injuries fell within the 90/180 day category must be substantiated by objective medical proof; self-serving statements are insufficient." *Id*. (citations omitted).

In the present case, Plaintiff has not met his burden of proof to show that he was unable to "perform[] substantially all of the material acts which constitute [his] usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the [accident]." *See* N.Y. Ins Law § 5102(d). Plaintiff's expert, Dr. McMahon, testified that Plaintiff was unable to work during the three-month period after the accident and that Plaintiff's activities "such as walking up and down stairs, normal activities [and] walking generally" were "restricted," but did not testify that Plaintiff was prevented from performing his usual activities to a great extent. (*See* Tr. at 111-12.)

Again, with respect to any limitations caused by injuries to Plaintiff's spine in the six months after the accident, I give very little weight to Dr. McMahon's testimony due to his lack of expertise. Instead, I credit the testimony of Dr. Fischer that any injury to Plaintiff's spine as a result of the August 7, 2015 accident did not result in any significant limitations. And, with respect to any limitations caused by injuries to Plaintiff's knees in the six months following the accident, I find Dr. Bosco far more credible than Dr. McMahon.

Based upon the evidence in the record, including the credible testimony from Defendant's experts, I find that Plaintiff's ability to perform activities in the 120 days after the accident only was slightly curtailed. Thus, Plaintiff has not met his burden.

In sum, based upon review of all the evidence, and having assessed the credibility of the witnesses, the Court finds that Plaintiff has not suffered a "serious injury" under the New York Insurance Law, precluding any recovery in this case.

## CONCLUSION

For the foregoing reasons, it is hereby Ordered that judgment is rendered in favor of the Defendant dismissing the Complaint. The Clerk of Court is respectfully requested to close this case.

Dated: New York, New York
      October 9, 2020

                                       **SO ORDERED**.

                                       _____

                                       **STEWART D. AARON**
                                       **United States Magistrate Judge**